CALIFORNIA HOSPITAL ASSOCIA-
TION, a nonprofit California Corpora-
tion, and United Hospital Association, a
nonprofit California Corporation, Lind-
say District Hospital, a District Hospi-
tal, West Adams Community Hospital, a
community nonprofit hospital corpora-
tion, Van Nuys Community Hospital, a
general partnership, Anaheim General
Hospital, a California Corporation, Fres-
no Community Hospital, a nonprofit
California Corporation, John Muir Me-
morial Hospital, a nonprofit California
Corporation, Samuel Merrit Hospital, a
nonprofit California Corporation, Rose-
ville Community Hospital, a nonprofit
California Corporation, individually and
on behalf of all similarly situated,
Plaintiffs-Appellees,

v.

Mario OBLEDO, Secretary of Health and
Welfare, State of California, Jerome A.
Lackner, M.D., Director of Health, State
Department of Health, State of Califor-
nia, and David Matthews, Secretary of
Health, Education and Welfare, De-
fendants-Appellants.

No. 77–2220.

United States Court of Appeals,
Ninth Circuit.

Aug. 27, 1979.

■■■■■■■■■■■■■■■■■■■■■■

Evelle J. Younger, Atty. Gen., Sacramento, Cal., Joseph Califano, Sec. HEW Dept. of Justice, Washington, D. C., Michael H. Cook, argued, Washington, D. C., Floyd D. Shimomura, argued, Deputy Atty. Gen., Sacramento, Cal., J. Mark Waxman, argued, Los Angeles, Cal., for defendants-appellants.

James B. Bertero, Los Angeles, Cal., Robert A. Klein, argued, James B. Bertero, argued, Los Angeles, Cal., for plaintiffs-appellees.

Before BROWNING and TANG, Circuit Judges, and CLAIBORNE,* District Judge.

BROWNING, Circuit Judge:

Two questions are presented: (1) whether under the Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq., (which provides for federal funding of state programs to furnish medical assistance to people with low income) the Secretary of HEW may approve a provision of a state program that limits reimbursement of hospitals for inpatient care to a fixed percentage of the particular hospital's costs for the previous year; and (2) whether the procedures followed in adopting such a provision in California's Medi-Cal program satisfied the requirements of law. We hold that imposition of a ceiling on reimbursement is not barred by the Medicaid Act, but that the Secretary did not comply with the Act in approving the California provision.

Before 1972, states participating in the Medicaid program were required to reimburse hospitals for inpatient services in accordance with the regulations promulgated by the Secretary of HEW governing payment for such services under the Medicare Act, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., (a federal health insurance program for the aged and disabled.) *See Massachusetts General Hospital v. Weiner,* 569 F.2d 1156, 1158 (1st Cir. 1978). In 1972, Congress amended the Medicaid Act to permit states to develop their own plans for payment of the reasonable cost of inpatient hospital services in lieu of the system used under Medicare. Social Security Amendments of 1972, Pub.L.No. 92–603, § 232, 86 Stat. 1329, 1410. These state plans must be approved by the Secretary of HEW, and payments under such plans cannot exceed the amounts that could be paid under the Medicare formula.[1]

On March 26, 1975, California submitted a proposed reimbursement plan to HEW. Although continuing to adhere to the Medicare reimbursement formula in most respects, the California plan imposed a percentage ceiling on increases in a hospital's reimbursable costs over those of the preceding year. The percentage change was to be updated annually "to reflect cost trends in the hospital industry and the general economic outlook." An "administrative adjustment procedure" was to be provided "for any hospital experiencing extraordinary, but necessary, inpatient costs exceeding the set percentage increase." In anticipation of HEW approval of its plan, California, on July 31, 1975, froze interim reimbursement at June 30, 1975 rates. HEW approved the California plan on March 31, 1976.

---

* Honorable Harry E. Claiborne, United States District Judge for the District of Nevada, sitting by designation.

1. As amended, the relevant provision of the Medicaid Act reads:
   A State plan for medical assistance must . . . provide . . . for payment of the reasonable cost of inpatient hospital services provided under the plan, as determined in accordance with methods and standards . . . which shall be developed by the State and reviewed and approved by the Secretary and (after notice and approval by the Secretary) included in the plan, except that the reasonable cost of any such services as determined under such methods and standards shall not exceed the amount which would be determined under [the Medicare formula] as the reasonable cost of such services . . . .
   42 U.S.C. § 1396a(a)(13)(D).

■ Two hospital associations and a number of individual hospitals filed this action seeking a declaration that the California plan violated both federal and state law, and an injunction barring implementation of the plan. After trial, the district court held the plan invalid on the grounds, among others, that the Medicaid Act and its implementing regulations do not permit a ceiling on reimbursable costs, and that the particular plan proposed by California had not been properly approved by HEW. The court enjoined implementation of this plan or any other that included a fixed percentage limit on the amount of cost increase.[2]

### I.

■ We consider first whether the Medicare Act and implementing regulations bar imposition of ceilings on reimbursable inpatient costs.

It is clear that the 1972 amendment to the Medicare Act authorized the Secretary to impose ceilings on reimbursable inpatient costs under the Medicare program. We are persuaded that the Secretary correctly concluded that the 1972 amendment to the Medicaid Act also authorized the Secretary to approve state reimbursement plans imposing such ceilings under the Medicaid program.

Under the provisions of the Medicare Act both before and after the 1972 amendment, hospitals were to be reimbursed for the "reasonable cost" of inpatient services. *See* 42 U.S.C. § 1395x(v)(1) (1970) and 42 U.S.C. § 1395x(v)(1)(A) (1976). Under Medicare regulation applicable before 1972 costs

could not be disallowed until after the service had been rendered, and in practice hospitals were reimbursed for whatever cost they had incurred. There was little incentive to contain cost or produce needed services efficiently. *See* H.R.Rep. 231, 92d Cong., 1st Sess. 80, 83 (1971), *reprinted in* 1972 U.S.Code Cong. & Admin.News, pp. 4989, 5066. To meet this problem, Congress redefined "reasonable cost" as "the cost actually incurred" but with a specific exclusion of "any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). Moreover, the Secretary was expressly authorized to issue regulations providing "for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services." *Id.*

The Medicaid Act does not explicitly permit a state plan to place limits on inpatient hospital costs. Rather as noted, the 1972 amendment to the Medicaid Act authorizes the states to develop, and with HEW approval to implement, plans for the payment of "reasonable cost" for such services. 42 U.S.C. § 1396a(a)(13)(D). Congress did provide, however, that "reasonable cost" as determined under a state plan "shall not exceed the amount which would be determined [under the Medicare Act] as the reasonable cost of such services." *Id.* This provision incorporates into the Medicaid Act

---

**2.** The district court also invalidated the freeze order of July 31, 1975, but the appeal from this ruling is moot. The freeze order affected only interim payments during the latter half of 1975 and expired on December 31, 1975, and the cost of health services provided during that period has been reimbursed at the unchallenged Medicare rate. The freeze order is not saved from mootness because "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). It may be true that an order freezing the rate of interim payments for a brief period is likely to expire before it can be fully litigated, *see Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46

L.Ed.2d 350 (1975), but there is no "cognizable danger, a reasonable expectation, of recurrence." *Williams v. Alioto,* 549 F.2d 136, 143 (9th Cir. 1977). California has issued no other freeze orders, and is continuing to make interim payments in accordance with the Medicare regulations. *Compare Maher v. Roe,* 432 U.S. 464, 468–69 n.4, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). Thus, California's expired, unrepeated freeze order "reflect[s] neither a policy it had determined to continue, nor even a consistent pattern of behavior." *Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 187, 99 S.Ct. 983, 992, 59 L.Ed.2d 230 (1979) (citations omitted).

the authority, discussed above, expressly granted the Secretary under the Medicare Act to exclude "any part of incurred cost found to be unnecessary in the efficient delivery of needed health services" by setting "limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items of services." Limits on the cost of general routine inpatient services established by the Secretary under the Medicare Act, see 20 C.F.R. § 405.460 (1976); 39 Fed.Reg. 20168 (1974); 40 Fed.Reg. 17190, 23622 (1975); 41 Fed.Reg. 26992 (1976); 42 Fed.Reg. 35496, 53675 (1977), serve simultaneously as limits on the cost of those services reimbursable under Medicaid. *Rhode Island Hospital v. Califano*, 585 F.2d 1153, 1155–56 (1st Cir. 1978).

It is unlikely that Congress would have authorized the Secretary to indirectly set limits on Medicaid cost by establishing cost limits under the Medicare Act, yet deny him the authority to approve provisions of a Medicaid state plan that set limits on reimbursable cost. The problem with the two health care programs was the same. Prior to the 1972 amendment, payments under both programs were made on the basis of reimbursement of costs already incurred; as the House Report noted, "[E]xperience under the medicare, *medicaid*, maternal and child health, and other third party programs has clearly demonstrated there is little incentive to contain costs or to produce the services in the most efficient and effective manner." H.R.Rep. 231, 92d Cong., 1st Sess. 80 (1971), *reprinted in* 1972 U.S.Code Cong. & Admin.News, p. 5066 (emphasis added). The same report expressly referred to costs under Medicaid in justifying the amendment to the Medicare Act authorizing the Secretary to limit Medicare reimbursement to costs necessary to the efficient delivery of needed health services:

> Where the high costs do in fact flow from the provision of services in excess of or more expensive than generally considered necessary to the efficient provision of appropriate patient care, patients may nevertheless desire such services. It is not the committee's view that if patients desire unusually expensive service they should be denied the service. However, it is unreasonable for medicare or *medicaid* (which are financed by almost all people in the country rather than the patient or community that wants the expensive services) to pay for it.

*Id.* at 83, *reprinted in* 1972 U.S.Code Cong. & Admin.News, p. 5069 (emphasis added).[3]

In short, the language and legislative history support HEW's interpretation of the Medicaid Act as authorizing the Secretary to approve provisions in state plans placing a ceiling on reimbursable costs.[4] Some lim-

**3.** An isolated statement in the House Report that the Secretary could disapprove a plan that did not reimburse actual cost, *id.* at 101, *reprinted in* U.S.Code Cong. & Admin.News, p. 5087, has little weight in light of the text of the statute and the bulk of the legislative history which make clear that some actual cost is not to be reimbursed. Nor is a statement in the Senate Report *opposing* the 1972 Medicaid amendment because "[t]he possibility exists that [the amendment] may provide the opportunity for States to reimburse hospitals under medicaid at less than the cost of medicaid services, [a possibility that] would be undesirable," S.Rep. 1230, 92d Cong., 2d Sess. 325 (1972), helpful to appellees in light of the Senate's ultimate favorable action on this provision.

Finally, the hospitals argue that the repeal of a Medicaid provision limiting reimbursable nursing home costs increases to 5%, Act of July 9, 1973, Pub.L.No. 93–66, § 234, 87 Stat. 152, 160, repealing § 225 of Pub.L.No. 92–603, 86 Stat. 1329, 1396 (1972), evidences a congres-

sional determination that *all* ceilings are inconsistent with the Medicaid Act. The repeal shows only that Congress thought the nursing home cost ceiling was arbitrary.

**4.** Deference to the construction of a statute by those charged with its enforcement is particularly appropriate when the meaning of a statutory term is unclear, *see, e.g., Shea v. Vialpando*, 416 U.S. 251, 262 n.11, 94 S.Ct. 1746, 40 L.Ed.2d 120 (1974), as is the meaning of "reasonable cost" with respect to the validity of prospective cost limitations. The expert judgment of an agency intimately familiar with the practical operation of a complex program is often the best guide to the meaning of such a broad statutory term. *See, e.g., Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 371–72, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); *Lewis v. Martin*, 397 U.S. 552, 559, 90 S.Ct. 1282, 25 L.Ed.2d 561, 94 S.Ct. 1746 (1970).

Appellees argue that *Shea v. Vialpando, supra*, 416 U.S. 251, supports the position that

its might be so arbitrary or restrictive as to preclude the payment of "reasonable cost" as required by law, but the district court erred in concluding that all ceilings would inevitably prove inconsistent with the Medicaid Act. *See Massachusetts General Hospital v. Weiner*, 569 F.2d 1156 (1st Cir. 1978).[5]

## II.

We next consider the sufficiency of HEW's review of the California plan. We conclude that the HEW's approval of the plan must be set aside because the review given the plan did not satisfy the requirements of the Medicaid Act.

The Medicaid Act provides that a state plan for medical assistance must provide "for payment of the reasonable cost of inpatient hospital services provided under the plan, as determined in accordance with methods and standards . . . which shall be developed by the State and *reviewed and approved by the Secretary*." 42 U.S.C. § 1396a(a)(13)(D) (emphasis added). The district court found that "[t]he economic forecasting methodology which was part

of the economic justification [of the percentage ceiling fixed in the California plan] was never the subject of independent, critical review" by HEW. This finding was not clearly erroneous. We agree with the district court the California plan's "methods and standards" for determining reasonable cost were not "reviewed and approved" as required by the Act.

The California proposal was in two parts. The first consisted of a single page, four paragraph statement outlining the proposed plan. According to the outline, a hospital would be paid the reasonable cost of inpatient care "provided that the hospital's average daily cost does not exceed a set percentage of the previous year's average daily cost. The percentage change will be updated annually to reflect cost trends in the hospital industry and general economic outlook." The base cost would be determined in accordance with Medicare standards and principles. Administrative adjustment procedures would be provided "for any hospital experiencing extraordinary, but necessary, inpatient costs exceeding the set percentage increase." [6]

"reasonable cost" may not be limited. *Shea* concerned the validity of a state imposed limit on work expenses that could be deducted from income in determining eligibility for assistance under the Aid to Families with Dependent Children (AFDC) program, 42 U.S.C. § 601, et seq. The Supreme Court emphasized that the AFDC Act required "the consideration of 'any' reasonable work expenses in determining eligibility for AFDC assistance." 416 U.S. at 260, 94 S.Ct. at 1753, and concluded that "[i]n light of the evolution of the statute and the normal meaning of the term 'any'," the state could not impose a limit on deductible work expenses. *Id.* As has been shown, the evolution and language of the Medicaid Act argues for a contrary construction.

5. The district court concluded that HEW regulations precluded a provision in a state plan setting a ceiling on reimbursable costs, apparently on the theory that because a ceiling sets only a maximum rate it does not provide the "[i]ncentives for efficiency and economy" required of a state plan by 45 C.F.R. 250.-30(a)(ii)(a). But a negative incentive may be effective; HEW could reasonably conclude that the possibility of losing money due to wasteful management is a potent incentive for efficiency and economy even absent the possibility of earning a "profit." Congress endorsed this

view in authorizing the Secretary to carry out experiments to determine the advantages of paying providers of medical services on the basis of a rate fixed in advance "in order to stimulate such providers through positive *(or negative)* financial incentives to use their facilities and personnel more efficiently." Section 222(a) of Social Security Amendments of 1972, Pub.L.No. 92–603, 86 Stat. 1329, 1390 (set out in note to 42 U.S.C. § 1395b–1 (emphasis added)).

6. The first part of the California proposal read in full as follows:

The State agency will pay the lesser of customary charges or the reasonable cost of inpatient hospital services provided that the hospital's average daily cost does not exceed a set percentage of the previous year's average daily cost. The percentage change will be updated annually to reflect cost trends in the hospital industry and the general economic outlook. Any modifications of the percentage change to be allowed will be the subject of a public hearing in which the Department will consider information presented by hospitals, their representatives and other interested parties before such changes are made.

The second part of the proposal consisted of a six page appendix containing, in the words of its introductory paragraph, "an analysis of hospital costs and the methods . . . used to estimate reasonable cost increases hospitals can expect to face" during the fiscal year beginning July 1, 1975. A random sample of hospital cost statements was used to identify the components of hospital costs, and the relationship each component bore to the total. Economic indicators were applied to each component to estimate the change that would occur during the next fiscal year. Projected changes were then multiplied by the percentage each component represented of total cost. The result was a projected increase of 9.98% which was rounded to 10%. Thus, the ceiling for "reasonable cost" for the fiscal year beginning July 1, 1975 was fixed at 110% of a hospital's cost during the preceding fiscal year.

HEW admits that it did not review the 110% figure or the calculations that produced it. Indeed, as we read HEW's brief, HEW confined its review and approval to the first part of the California proposal—the four paragraph opening statement—and neither reviewed nor approved the contents of the appendix or any other matter. This falls short of the review required by the statute.[7]

The legislative history of the 1972 Medicaid amendment underscores the importance of HEW evaluation of all factors having a substantial bearing upon the determination of the reasonable cost of inpatient hospital services. As it passed the House, Section 232 of H.R. 1, 92d Cong., 2d Sess., which was to become the 1972 Medicaid amendment, did not provide for prior HEW review and approval of state plans. See 117 Cong.Rec. 21434, 21463 (1971). The Senate deleted the Medicaid amendment entirely, fearing that "[t]he possibility exists that [the amendment] may provide the opportunity for States to reimburse hospitals under medicaid at less than the cost of medicaid services." S.Rep. 1230, 92d Cong., 2d Sess. 325 (1972). Although the Conference Committee restored the amendment, it added the requirement that before a state plan could be implemented its "methods and standards" must be reviewed and approved by HEW. See H.R.Rep.No. 1605, 92d Cong., 2d Sess. 53 (1972) (Conference Report), reprinted in 1972 U.S.Code Cong. & Admin.News, p. 5386. This history suggests Congress intended the Secretary's review to be sufficient in scope to afford reasonable assurance that adherence to the methods and standards proposed by the state would result in a fair determination of reasonable cost. A review confined to the general outlines of the California proposal could not produce that assurance.

For example, the district court found that the methods and standards utilized by California in calculating the 110% ceiling "failed to take into account certain factors, changing service intensity as a major factor contributing to increasing hospital costs, and the wide variation and differentiation

In calculating the cost of inpatient hospital services provided to recipients of medical assistance, the State agency will apply the same standards and principles as set forth in Code of Federal Regulations, Title 20, Chapter III, Part 405, Subpart D (HIRM–1, as revised), issued by the Social Security Administration.

The State agency will provide for a system to assure that the claims by providers for reimbursement for inpatient hospital services meet the requirements for reasonable cost, as set forth in Code of Federal Regulations, Title 20, Chapter III, Part 405, Subpart D, (as revised), provided that payment levels will not change at a rate greater than permitted by the percentage change.

The State agency will provide extraordinary administrative adjustment procedures for any hospital experiencing extraordinary, but necessary, inpatient costs exceeding the set percentage increase. However, no extraordinary administrative adjustment will be permitted to exceed the requirements for reasonable cost, as set forth in Code of Federal Regulations, Title 20, Chapter III, Part 405, Subpart D, (as revised).

7. On June 29, 1976, a cost ceiling was set for fiscal 1976 limiting reimbursable cost to a 7% increase over fiscal 1975. This subsequent ceiling was apparently determined by the same "methods and standards" as was the 110% ceiling but was otherwise not reviewed or approved by HEW.

among the cost structures of individual participating hospitals." The outline of California's proposal simply asserts that the allowable percentage change over the previous year's cost is to be updated each year "to reflect cost trends in the hospital industry and the general economic outlook." Only the appendix discloses that the ceiling is limited to increases from anticipated inflation, and is based on a formula that considers neither changes in service intensity nor variations in the cost structures of different hospitals.

California responds that the outline of the California plan provides for the creation of an administrative appeals mechanism, and argues that consideration of the deficiencies found by the district court are appropriately left to that administrative appeals process. The outline of the California proposal simply recites without further particularization that an administrative appeals process will be available. However, the state regulation establishing the procedure disclose that access to the appeal process is so conditioned that, according to evidence offered at trial, one-third to one-half of the hospitals participating in the Medi-Cal program could not in fact obtain review.[8] On the basis of this evidence, the district court concluded that the appeals procedure "did not provide a reasonable alternative method for hospitals to obtain costs to which they are entitled by law."

It is unnecessary to decide whether these alleged deficiencies render the California plan inconsistent with the Medicaid Act. It is clear that they are of sufficient substance to require evaluation by HEW before the agency could determine whether the California plan would result in a fair determination of reasonable cost.[9] Since HEW's review and approval were limited to a general statement that did not disclose the features of the state program to which these problems relate, the review and approval did not satisfy the statute.

We do not now consider the various other respects in which federal and state laws are said to have been violated by the substance of the California plan or the manner in which the plan was adopted. These objections may not survive the agency's reconsideration of the plan.

Affirmed in part; reversed in part.

---

8. An application for administrative adjustment may be granted only if the applicant "had an average daily occupancy rate for licensed beds, during the year in question, equal to or greater than 70%," subject to waiver if a hospital's continued participation in the Medi-Cal program is necessary to assure an adequate number of hospital beds in the area. 22 Calif.Admin.Code § 51508.5(a)(3). There was testimony that less than half of California's hospitals had an occupancy rate of 70% or greater.

9. HEW estimated that nearly one-half of the increase in cost per patient day between 1950 and 1973 resulted from increases in the scope and intensity of the care afforded. *See Department of Health, Education, and Welfare, Medical Care Expenditures, Prices and Cost: Background Book*, Pub.No. (SSA) 11909 (1975) at 39.