PENTUCKET MANOR CHRONIC HOSPITAL, INC., & others[1] *vs.*
RATE SETTING COMMISSION & another[2].

Suffolk. November 5, 1984. — March 12, 1985.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & LYNCH, JJ.

*Practice, Civil,* Appeal, Judgment, Relief from judgment. *Judgment,*
Amendment, Relief from judgment. *Rate Setting Commission.*
*Medicaid. Hospital,* Medicaid reimbursement.

A motion to vacate judgment, which sought correction of errors of law in an
action against the Rate Setting Commission and which was served within
ten days after entry of judgment, was treated by this court as having
been made under Rule 59 (e) of the Massachusetts Rules of Civil Proce-
dure, rather than under rule 60 (b), with the result that a party could
file a timely notice of appeal from the judgment within sixty days after
the making of an order denying the motion. [235-237]

Where the Rate Setting Commission, following an audit of information sub-
mitted by three hospitals participating in the Medicaid program, deter-
mined that the owner-administrators of the hospitals had been paid ex-
cessive salaries during the periods covered by the audit, the commission's
action in reducing the hospitals' rates of Medicaid reimbursement for
those periods did not violate the prospective system of rate setting estab-
lished in G. L. c. 6A, § 32, and was permitted by relevant provisions
of State and Federal regulations governing hospital reimbursement.
[240-245]

CIVIL ACTION commenced in the Superior Court Department
on December 6, 1978.

The case was heard by *Paul G. Garrity*, J., on a master's
report.

---

[1] Newburyport Manor Chronic Hospital, Inc., and Beaconcrest Chronic
Hospital, Inc.

[2] The chief hearing officer of the Division of Hearing Officers.

After an appeal was dismissed by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Ellen L. Poster* (*Stanley M. Poster* with her) for the plaintiffs.

*Ellen L. Janos,* Assistant Attorney General, for the defendants.

LIACOS, J. We granted further appellate review to the plaintiffs, three proprietary chronic-care hospitals (hospitals). They claim error in the issuance of an Appeals Court order which summarily dismissed their appeal on the ground that the filing of the appeal was untimely. In addition, the hospitals allege error by the judge of the Superior Court in his determination of the merits of their claim.

The defendant Rate Setting Commission (commission) had reduced previously set rates of Medicaid reimbursement for the plaintiff hospitals. The hospitals appealed the commission's action to the Division of Hearings Officers (division). See G. L. c. 6A, § 36. After the division affirmed the rate reductions, the hospitals sought review in the Superior Court. See G. L. c. 6A, § 36; G. L. c. 30A, § 14. On January 4, 1983, a Superior Court judge entered a judgment for the commission, based upon a recommendation by a special master that the decision of the division be affirmed.[3]

The hospitals moved to vacate the judgment on January 12, 1983. The judge denied the motion on April 4, 1983. On April 29, 1983, the hospitals filed a notice of appeal. The Appeals Court declined to reach the merits of the hospitals' claims because the hospitals had failed to file their notice of appeal within sixty days of the entry of judgment on January 4, 1983.

The Appeals Court treated the hospitals' motion to vacate as a motion under Mass. R. Civ. P. 60 (b), 365 Mass. 828 (1974),[4]

---

[3] Review of an administrative decision is generally confined to the record. G. L. c. 30A, § 14 (5). *Martin* v. *Director of the Div. of Employment Sec.,* 347 Mass. 264, 268 (1964). The record in the instant case indicates that the special master did not hold evidentiary hearings, but rather reviewed the record as would a Superior Court judge.

[4] Massachusetts R. Civ. P. 60 (b), reads in part: "Mistake; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc. On motion and

the filing of which does not toll the running of the sixty-day appeal period under Mass. R. A. P. 4 (a), as amended, 393 Mass. 1239 (1985). The hospitals contend that their appeal was timely filed within ten days after entry of judgment, and that their motion falls under Mass. R. Civ. P. 59 (e), 365 Mass. 827 (1974),[5] which tolls the running of the sixty-day appeal period.

There are no Massachusetts decisions which address the issue whether a motion to vacate, if served within ten days of judgment, should be treated as a rule 59 (e) motion to alter or amend judgment, or as a rule 60 (b) motion for relief from judgment. The only decision of this court which has touched upon this issue assumed a motion to reconsider was a rule 60 motion. *Wolfberg* v. *Hunter,* 385 Mass. 390, 392 n.4 (1982). In the instant case, both the trial judge and the Appeals Court treated the hospitals' motion to vacate as one for reconsideration, and cited *Wolfberg, supra,* to place it under rule 60.

The Reporters' Notes to rule 59 (e) state that the rule encompasses a motion for rehearing, reconsideration, or vacation. Reporters' Notes to Mass. R. Civ. P. 59 (e), Mass. Ann. Laws, Rules of Civil Procedure at 560 (1982).[6] We believe

---

upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order or proceeding was entered or taken."

[5] Massachusetts Rule of Civil Procedure 59 (e), states: "Motion to Alter or Amend a Judgment. A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment."

[6] Cf. 6A Moore's Federal Practice par. 59.12[1], at 59-289 (2d ed. 1984): "Although the motion under [rule 59] (e) is to 'alter or amend' the judgment, it would perhaps be more accurate to say that subdivision (e) deals with

the better approach, and that taken by some Federal courts, is that substance, not labels, should control in determining whether a postjudgment motion is a rule 59 (e) motion or a rule 60 motion. See, e.g., *Sunstream Jet Express, Inc.* v. *International Air Serv. Co.*, 734 F.2d 1258, 1273 (7th Cir. 1984); *Smith* v. *United States Parole Comm'n*, 721 F.2d 346, 348 (11th Cir. 1983).[7] The hospitals alleged that (1) the master's report adopted by the Superior Court judge was deficient in some findings, (2) the master misunderstood the purpose of the audit procedure, and (3) the master's conclusions were not supported by the record. The hospitals had raised these same errors in a prejudgment motion. The only provision of rule 60 (b), into which the motion to vacate arguably could fit, is rule 60 (b) (6), which provides for motions for "any other reason justifying relief from the operation of the judgment." See note 4, *supra*.

"As a general principle, we apply to our rules of civil procedure the construction given to the cognate Federal rules." *Chavoor* v. *Lewis*, 383 Mass. 801, 806 n.5 (1981). Rule 60 does not provide for general reconsideration of an order or a judgment. *Blair* v. *Delta Air Lines, Inc.*, 344 F. Supp. 367, 368 (S.D. Fla. 1972). Nor does it provide an avenue for challenging supposed legal errors, nor for obtaining relief from errors which are readily correctible on appeal. *Id.*, citing 3 W.W. Barron & A. Holtzoff, Federal Practice and Procedure (Rules ed.) § 1322 (Wright rev. ed. 1958). *Roque* v. *Redlands*, 79 F.R.D. 433, 435 (C.D. Cal. 1978). Relief under rule 60 (b) (6) will be granted only in extraordinary circumstances. *Artco, Inc.* v. *DiFruscia*, 5 Mass. App. Ct. 513, 517 (1977). *Larsen* v. *International Business Machs. Corp.*, 87 F.R.D. 602, 604 (E.D. Pa. 1980). *Roque, supra.*

motions to alter, amend, or *vacate*. It would be an unreasonably narrow position to hold that a judgment may be modified and amended only up to the thin line where it amounts to a vacation of the judgment altogether." (Emphasis in original.)

[7] Indeed, some courts have gone so far as to treat motions labeled rule 60 (b) as rule 59 (e) motions. See *Dove* v. *Codesco*, 569 F.2d 807, 809 (4th Cir. 1978); *Sea Ranch Ass'n* v. *California Coastal Zone Conservation Comm'ns*, 537 F.2d 1058, 1061 (9th Cir. 1976).

7 Moore's Federal Practice par. 60.27[2], at 60-274 (2d ed. 1982). 11 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2864, at 219 (1973), and cases cited therein. The circumstances of the instant case cannot be considered so extraordinary as to bring them within the purview of rule 60 (b) (6).

Where doubt exists as to the proper characterization of a postjudgment motion, some courts simply treat all timely-filed motions which call into question the correctness of a judgment as rule 59 (e) motions. See *Western Indus., Inc.* v. *Newcor Canada Ltd.,* 709 F.2d 16, 17 (7th Cir. 1983); *Dove* v. *Codesco,* 569 F.2d 807, 809 (4th Cir. 1978); *Foman* v. *Davis,* 292 F.2d 85, 87 (1st Cir. 1961). Cf. *Seshachalam* v. *Creighton Univ. School of Medicine,* 545 F.2d 1147 (8th Cir. 1976). We find this approach consistent with our view described in *Page* v. *New England Tel. & Tel. Co.,* 383 Mass. 250, 252 (1981), that rule 59 (e) is designed to correct judgments which are erroneous because they lack legal or factual justification.[8] We conclude that, because the hospitals' motion to vacate was served within ten days of judgment and because the relief sought was correction of errors of law, it properly can be considered a rule 59 (e) motion. Thus, the appeal was timely. We proceed to consider the merits of the plaintiffs' appeal.

We give a brief summary of the facts and of the Medicaid program, necessary to an understanding of the substantive issues. Although the Federal government and each participating State jointly fund the Medicaid program, each State designs its own program within certain Federal guidelines. See 42 U.S.C. § 1396 et seq. (1976 & Supp. III 1979). Massachusetts

---

[8] We reject the narrow approach which the commission urges us to adopt. See *Durkin* v. *Taylor,* 444 F. Supp. 879, 889 (E.D. Va. 1977); *Erickson Tool Co.* v. *Balas Collet Co.,* 277 F. Supp. 226, 234 (N.D. Ohio 1967); *American Fed'n of Teachers Local 2012* v. *Rhode Island Bd. of Regents for Educ.,* 477 A.2d 104, 106 (R.I. 1984). "One of the purposes of the rules of [civil and] appellate procedure was undoubtedly to simplify that procedure by eliminating many of the previous rigid statutory time limitations which often served as fatal or near-fatal booby traps for inexperienced or unwary practitioners taking a case from the trial court to the appellate court." *Giacobbe* v. *First Coolidge Corp.,* 367 Mass. 309, 315 (1975).

participates in the Medicaid program, and the Department of Public Welfare is charged with the responsibility to ensure that the program is administered in accordance with Federal law. See G. L. c. 118E, §§ 4, 6. During the years relevant to this appeal, participating States submitted plans for approval by the Secretary of the Department of Health and Human Services, which were required to conform to the requirements of 42 U.S.C. § 1396a and regulations promulgated thereunder. Federal regulations established the following criteria for States electing not to adopt Title XVIII of the Social Security Act (Medicare) systems of repayment:[9] incentives for efficiency and economy; reimbursement on a reasonable cost basis; and reimbursement not exceeding that allowable under Title XVIII standards and principles of cost reimbursement. See 45 C.F.R. 250.30(a)(2) (1969).[10]

In 1974, the commission adopted a new system of reimbursement for hospitals through the promulgation of Regulation 74-1, under the authority of G. L. c. 6A, § 32. Under the regulation, the commission separately calculates a rate for each hospital prior to the beginning of the rate year. The rate is based on operating costs reported by each hospital for its "base" year (two years prior to the rate year), and increased by an inflation factor. Added to this figure are a hospital's base year "non-operating" expenses and any additional allowance resulting from administrative adjustments.[11] If a hospital's actual rate year expenses are less than projected, it need not return

---

[9] States had been required to reimburse health care providers according to principles of reimbursement developed under the Medicare system. In 1972, legislative changes permitted States to implement reimbursement methods which departed from those of Medicare. See *infra* at 243-244.

[10] The Federal regulation, 45 C.F.R. 250, was redesignated 42 C.F.R. 450 in 1977. The regulation 45 C.F.R. 250.30(a)(2) (1974) may be found at 39 Fed. Reg. 28, 288 (1974).

[11] A hospital may apply for administrative adjustments in certain circumstances to receive reimbursement for a limited number of rate year costs. See Regulations 74-1 and 74-26, §§ 9.1-9.3; 14 Code Human Services Regs. 3, § 3.73; 14 Code Human Services Regs. 3, as amended, § 3.74. The plaintiff hospitals have applied for and received these administrative adjustments.

the overage. On the other hand, if its actual expenses are more than projected, it is not reimbursed for the difference.

The commission originally adopted the rates here at issue by using cost information contained in forms known as HCF-100 and HCF-400 submitted by each hospital to the commission. After the rates were set, the commission conducted audits on every HCF-100 and HCF-400 submitted by the hospitals during the four-year period of 1974-1977. The commission had received information from the Department of Public Health that the hospitals' administrative salaries included in the administrative expense category on the forms exceeded maximums set by Federal guidelines.[12] See 20 C.F.R. 405 et seq. (1968); Provider Reimbursement Manual.[13] The commission determined that the owner-administrators' salaries as reported by the hospitals on HCF-100 were excessive, reduced each allowance for "administration" cost, and reissued the rates at lower amounts.[14]

The hospitals do not contest the finding of excessiveness of their administrative cost claims, nor do they contest the power of the commission to establish reasonable levels of compensation for owner-administrators. Rather, they argue that, for a

---

[12] Audits for the base years 1972 and 1973 were commenced and then discontinued. The commission resumed auditing 1972-1973 base year information after notification by the Department of Public Health.

[13] The Federal Regulation, 20 C.F.R. 405, was redesignated 42 C.F.R. 405 in 1977.

[14] The administrator salaries involved were paid to Marjorie O'Toole, her husband, Joseph O'Toole, and to Mary O'Meara. All three had an ownership interest in the hospitals involved. The specific amounts paid to these owner-administrators were not shown separately in the original filings. The audits revealed that the three owner-administrators of the three hospitals were claiming salaries as follows:

|                   | 1972     | 1973     | 1974     | 1975     |
|-------------------|----------|----------|----------|----------|
| Marjorie O'Toole  | $61,320  | $61,963  | $66,082  | $64,920  |
| Joseph O'Toole    | 93,052   | 94,627   | 98,199   | 98,350   |
| Mary O'Meara      | 40,847   | 45,950   | 46,048   | 33,840   |

The Provider Reimbursement Manual guidelines for facilities of the size of each hospital ranged from $19,200 to $39,600.

variety of reasons, redetermination of their Medicaid payment rates was improper.[15] They first contend that redetermination violates the prospective system of rate setting established in G. L. c. 6A, § 32. Section 32, by its plain words, establishes a "prospective" system for rate setting. The statute is silent, however, as is the legislative history, as to whether or when rate redeterminations such as the one here at issue may be made.[16]

When the meaning of a statute is brought into question, a court properly should read other sections and should construe them together, *Holbrook* v. *Holbrook,* 1 Pick. 248, 250 (1822), so as to constitute an harmonious whole consistent with the legislative purpose. *Board of Educ.* v. *Assessor of Worcester,* 368 Mass. 511, 513-514 (1975). We note first that the sixth paragraph of § 32, after commanding the establishment of prospective rates whenever possible, then provides for the setting of "interim" rates. See note 16, *supra.* In the eighth paragraph of § 32 the Legislature establishes the ability of the commission to set a "preliminary final rate" and provides for auditing pro-

---

[15] All eight of the hospitals' arguments arise under G. L. c. 30A, § 14, and allege either error on the part of the Superior Court judge in failing to reverse the division's decision due to errors of law or that the division's decision itself was based on errors of law or was unsupported by substantial evidence.

[16] Paragraph 6 of § 32, prior to a 1981 amendment, provided in part: "The commission shall establish rates on a *prospective* basis, subject to rules and regulations promulgated by the commission whenever possible, provided however that, whenever the commission by regulation provides that a final rate for a reporting period shall be computed on the actual cost of a provider of services, or a state institution, for such period, it shall establish an interim rate for said provider or institution within twenty-one days of the beginning of said reporting period, from which interim rate said provider may appeal as provided under section thirty-six of this chapter" (emphasis supplied). Unless otherwise indicated, references to c. 6A, § 32, will be to provisions as they existed between 1974 and 1977.

Section 32 was enacted by St. 1973, c. 1229, § 2, replacing and enlarging former G. L. c. 7, § 30L. General Laws c. 7, § 30L, had no explicit provision for the setting of tentative or provisional rates, yet in *Murphy Nursing Home, Inc.* v. *Rate Setting Comm'n,* 364 Mass. 454, 458-459 (1973), this court found proper a regulation establishing a tentative rate.

cedures.[17] Finally, also in the eighth paragraph, the Legislature provides that ninety per cent of the difference between an interim and a preliminary final rate is payable by, or to, a governmental unit when certified to the State Secretary. See note 17, *supra*. The ability of the commission to set interim and preliminary final rates, and the provision for payment of differences between them, demonstrate that the Legislature anticipated the setting of tentative or provisional rates with allowances for later adjustment. Section 32 does not prohibit the adjustment of rates.

The hospitals also argue that the redeterminations of their rates violate the commission's own regulations governing hospital reimbursement. Specifically, the hospitals contend that the rate redeterminations, resulting from audits which revealed excessive administrative costs, are not authorized by the regulations. At issue are four regulations, each covering a separate rate year, promulgated pursuant to G. L. c. 6A, §§ 31-36.[18]

The regulations covering the first two years, Regulation 74-1 and Regulation 74-26, do not require explicitly that the commission conduct audits. The regulations do make reference, however, to audits in several instances, including the section pertaining to the method for determining rates and in the section

---

[17] "Whenever a final rate for a filing period is to be determined after the end of said period, the commission shall calculate a preliminary final rate within sixty-days after receipt of a satisfactory financial and operating cost report from a provider of services or state institution for such filing period. If said reports provide all the information required by the commission and are attested to by an independent licensed accountant or an independent certified public accountant . . . the commission may, prior to a field audit establish said preliminary final rate on the basis of said information submitted. . . . Ninety per cent of the difference between the interim rate and said preliminary final rate shall become payable by or to governmental units when certified to the state secretary. Said preliminary final rate may be promulgated as the final rate of a provider of services or state institution if the commission is satisfied with a provider's report. . . ." G. L. c. 6A, § 32, inserted by St. 1973, c. 1229, § 2.

[18] Regulation 74-1 governs rates beginning April 1, 1974; Regulation 74-26 governs the rate year beginning October 1, 1974; 14 Code Human Services Regs. 3 governs the rate year beginning October 1, 1975; 14 Code Human Services Regs. 3, as amended, governs the rate year beginning October 1, 1976.

concerning rate adjustments. See Regulation 74-1, §§ 4.3 and 9.5; Regulation 74-26, §§ 4.3 and 9.5. Accordingly, the regulations presume that audits will occur. Because the regulations should not be construed so as to make an audit provision inoperative or superfluous, see 2A C. Sands, Sutherland Statutory Construction § 46.06 (4th ed. 1984), it follows that audits may require rate redeterminations. More importantly, § 9.5 of Regulation 74-1 and of Regulation 74-26 states: "The Commission may, on its own motion, require an adjustment in the rate of a provider . . . where such rate had been established on the basis of unaudited base year cost information and subsequent audit reveals substantial error in the costs as reported by the provider."

In light of the regulation's purpose to "produce fair and reasonable rates of payment," we believe that the commission could conclude that "substantial error[s]" should include unreasonable administrative costs. Only reasonable costs properly may be used to determine rates. The discovery that the rates were fixed, in part, on the basis of excessive rates of compensation for owner-administrators clearly revealed a "substantial error," and the commission was entitled to readjust the rates on that basis.

The later regulations, 14 Code Human Services Regs. 3 and 14 Code Human Services Regs. 3, as amended, unambiguously authorize audits and anticipate the setting of rates before audits are complete: "Rates determined under this part shall be calculated from audited and adjusted HCF 400 statements when possible." 14 Code Human Services Regs. 3, § 3.54.[19] Section 3.55(b) of 14 Code Human Services Regs. 3 and 14 Code Human Services Regs. 3, as amended, provided that allowable hospital costs be determined in accord with 20 C.F.R. 405 et seq., and the Provider Reimbursement Manual. Furthermore, under these regulations, the commission may review a rate upon its own motion at any time, and is explicitly authorized to

---

[19] As amended, 14 Code Human Services Regs. 3 changed HCF 400 statements to RSC 100 or RSC 401 statements. 14 Code Human Services Regs. 3, § 3.54, as amended.

increase, decrease, or maintain a rate following review.[20] We conclude that redeterminations such as the ones here at issue are permitted under 14 Code Human Services Regs. 3 and 14 Code Human Services Regs. 3, as amended, and that the division did not err in concluding that the commission needs the power to review rates after audit to comply with Federal requirements.[21]

We next address the hospitals' contention that the rate redeterminations conflict with Federal mandates. A Federal regulation required that, if the medicare standards and principles were not adopted, the alternative methods and standards must provide "[i]ncentives for efficiency and economy." 45 C.F.R. 250.30(b)(1)(iii)(a) (1971). The hospitals argue that such incentives depend on their ability to rely on the finality of the rate set.

Prior to 1972, Federal law required participating States to reimburse hospitals for inpatient services provided to Medicaid patients on the basis of cost methodology used by the Federal Medicare program. In response to concerns about spiraling costs, Congress amended Title XIX of the Social Security Act in 1972 to allow each State to develop its own alternative reimbursement scheme. *Mississippi Hosp. Ass'n* v. *Heckler,* 701 F.2d 511, 515 (5th Cir. 1983). " '[E]xperience under the . . . *medicaid* . . . program[ ] ha[d] clearly demonstrated there [was] little incentive to contain costs or to produce the services

---

[20] 14 Code Human Services Regs. 3, § 3.76, provides: "To assure that an approved inpatient, outpatient, or well newborn rate is adequate and appropriate, the Commission may, at any time and upon its own motion, review an approved rate upon notice to the hospital."

14 Code Human Services Regs. 3, § 3.78, provides: "Upon notice of administrative review, a hospital shall submit such books, records, documentation, and information as the Commission may require. After review, the Commission will render a written decision and statement of reasons for its decision. The decision may include an increase, decrease, or maintenance of rate."

14 Code Human Services Regs. 3, as amended, did not significantly change these sections.

[21] Because we have decided that the redeterminations were appropriate under the regulations, we need not decide whether the division improperly deferred to the commission's construction of them.

in the most efficient and effective manner.' H.R.Rep. 231, 92d Cong., 1st Sess. 80 (1971), *reprinted in* 1972 U.S. Code Cong. & Admin. News, p. 5066 (emphasis added)." *California Hosp. Ass'n* v. *Obledo,* 602 F.2d 1357, 1360 (9th Cir. 1979). Regulation 45 C.F.R. 250.30(b)(1)(iii)(a) (1971) was promulgated presumably in accordance with this legislative concern.

The nature of a prospective methodology, such as the one here at issue, is to indicate to a hospital what its reimbursement will be for the coming year; the prospective system itself induces efficiencies and economies. *Hospital Ass'n of N.Y. State, Inc.* v. *Toia,* 473 F. Supp. 917, 938 (S.D. N.Y. 1979). While increased efficiency was a goal of the 1972 changes, Federal law also gave State authorities great flexibility in the areas of cost-finding and rate-setting. *Mississippi Hosp. Ass'n* v. *Heckler, supra.*

Regulation 74-1, which was approved by the Department of Health, Education and Welfare (HEW), provides several avenues for rate redetermination. Health care providers may request adjustments after the rate is set in a variety of circumstances. See Regulations 74-1 and 74-26, §§ 9.1-9.3; 14 Code Human Services Regs. 3, §§ 3.73-3.75; 14 Code Human Services Regs. 3, as amended, §§ 3.74-3.76. In addition, the commission may order a rate reduction where costs have been transferred or eliminated during the rate year. See Regulations 74-1 and 74-26, § 9.4; 14 Code Human Services Regs. 3, § 3.77; 14 Code Human Services Regs. 3, as amended, § 3.78.

Given these other avenues for rate redeterminations and their approval by HEW, we cannot say that the redetermination of a rate following revelation of a nonallowable expense defeats Federal mandates for incentives for economy and efficiency.[22] Accordingly, the division did not err in concluding that rate redeterminations are consistent with the prospective system

---

[22] We note that the record indicates that at least some of the recommended administrators' salaries were a matter of public record. Furthermore, Congress enacted Title XIX "to provide health care for the poor and aged, not to subsidize or otherwise to benefit health care providers." *Pennsylvania Pharmaceutical Ass'n* v. *Department of Pub. Welfare,* 542 F. Supp. 1349, 1355-1356 (W.D. Pa. 1982).

because they are permitted by the regulations in other circumstances.

Finally, the hospitals contend that the division based its decision on findings of fact which were not in the record, i.e., they were not stipulated to by the parties. Our reading of the record indicates that some of these findings may be inferred reasonably from the stipulations, and that, in any event, these facts are not necessary to support the division's conclusions. Accordingly, the judgment of the Superior Court is affirmed.

*So ordered.*