CurraN, Dennis J., J.
On December 6, 2007, a jury returned a verdict for the defendants, Akibia, Inc. (“Akibia”) and Thomas Tucker (“Tucker”), on all counts in an employment discrimination case brought by the plaintiff Dane A. Donaldson (“Donaldson”). Pursuant to Mass.R.Civ.P. 59 and Mass.R.Civ.P. 60(b)(1) and (6), Donaldson brings this motion for new trial and a motion to vacate the judgment. After a hearing and for the following reasons, the motions are DENIED.[2]
I. BACKGROUND
Akibia hired Donaldson on May 30, 2000 as Vice President of U.S. Operations. Akibia is a multi-na-tional computer services company, headquartered in Westborough, Massachusetts, which employs about 400 people in ten offices in the United States and Europe. Less than two years after hiring him, Akibia terminated Donaldson on April 29, 2002. At the time that Akibia terminated Donaldson, a ñfty-five year-old African-American, he had risen to the position of Senior Vice President of Global Operations.
Thomas Tucker, Akibia’s Chief Financial Officer and President of its Information Technology Support Services Division, made the final decision to terminate Donaldson. Tucker terminated Donaldson without prior warning and without giving Donaldson an opportunity to improve. Initially, Donaldson was told that he was being fired for his “style,” not his “performance.” Tucker later explained that he feared losing three key employees unless something was done with Donaldson. When Donaldson was terminated, he was earning in excess of $260,000 per year
Donaldson filed a Charge of Discrimination at the Massachusetts Commission Against Discrimination (“MCAD”) on October 11, 2002. He filed his Complaint for race discrimination, age discrimination, and retaliation in the Superior Court on March 19, 2003.
This matter was tried before a jury from Monday, November 26, 2007 through Thursday, December 6, 2007. Donaldson’s key allegations were that Akibia terminated him because of his race and/or his age, and further, that it retaliated against him for alleging illegal discrimination by, among other things, conditioning payment of a portion of his severance payment and bonus on signing a severance and release agreement.
Akibia countered that Donaldson was terminated because of his management style: specifically, that he was intimidating, managed by fear, and publicly embarrassed employees. These criticisms were no surprise to Donaldson because several months before, he had heard these same points from his employees in a mid-year corporate meeting. At that meeting, Donaldson suggested that one of the program topics be “How to Deal with Dane”; he drafted the talking points for discussion. Akibia held such a program; and its employees were quite candid about how they viewed Donaldson; indeed, thirty criticisms were directed to corporate officials about Donaldson’s management style. The near-constant theme was that he was intimidating, stubborn, abrupt, did not listen and humiliated employees. Akibia’s leadership shared these criticisms with Donaldson.
In the week before Donaldson was terminated, three key employees at Akibia threatened to quit because they could no longer abide his management style. After assessing that the situation had reached a breaking point, Akibia terminated Donaldson.
The case was tried over eight days; the jury deliberated for about eight hours; they rendered their verdict in favor of the defendants.
Additional facts will be discussed in the context of the various issues raised by Donaldson.
*530 II. DISCUSSION
A. MOTION FOR NEW TRIAL AND MOTION TO VACATE JUDGMENT STANDARDS
A new trial “ought not to be granted unless on a survey of the whole case it appears to the judge that otherwise a miscarriage of justice would result.” Wojcicki v. Caragher, 447 Mass. 200, 216 (2006). The decision whether to grant or deny a new trial rests within the discretion of the trial judge. Delfino v. Torosian, 354 Mass. 395, 399 (1968).
Donaldson additionally moves for relief under Mass.R.Civ.P. 60(b)(1) and (6). Under this rule, “the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; ... or (6) any other reason justifying relief from the operation of the judgment.” Mass.R.Civ.P. 60(b)(1) and (6). Rule 60 of the Massachusetts Rules of Civil Procedure does not “provide an avenue for challenging supposed legal errors, nor from obtaining relief from errors which are readily correctable upon appeal.” Pentucket Manor Chronic Hospital, Inc. v. Rate Setting Commission, 394 Mass. 233, 236 (1985). Rule 60(b)(1) requires the moving party to bear the “considerable burden of showing that the mistake was indeed excusable, and not due simply to its own carelessness.” Gath, 440 Mass. at 497. Rule 60(b)(6) relief can be granted “. . . only in extraordinary circumstances.” Pentucket Manor, 394 Mass. at 236. See In re Georgette, 54 Mass.App.Ct. 778, 788 (2002) (Rule 60(b) motions seek “life-saving treatment” from the court, “applicable in desperate cases”), aff'd, 439 Mass. 28 (2003). This is not a case of “extraordinary circumstances” warranting extraordinary relief. Donaldson fails to state with any specificity how he believes he warrants relief under Rule 60 as compared to that under Rule 59. His motion to vacate the judgment pursuant to Rule 60 must, therefore, be DENIED.
B. DONALDSON’S ARGUMENT
Donaldson moves for a new trial under Mass.R.Civ.P. 59. He claims that a new trial is necessary to avoid a miscarriage of justice, cure trial errors, and vacate a verdict which he claims was against the great weight of the evidence. He asserts a miscellany of reasons, including among others, the trial judge’s mispronunciation of the corporate defendant’s name, a recess was taken during the charge to research an issue of law, and conducting sidebar conferences. As an initial matter, the Court notes that Donaldson’s argument that the verdict was against the weight of the evidence is based primarily “. . . on a marshaling of only evidence favorable to [Donaldson] (and, therefore, an ignoring of contrary evidence).” Hartford Casualty Insurance Co. v. New Hampshire Insurance Co., 417 Mass. 115, 123-24 (1994). There was ample evidence supporting the jury’s verdict; it cannot reasonably be said that the verdict was “the product of bias, misapprehension or prejudice.” Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass. 119, 127 (1992). The verdict for the defendants was not against the weight of the evidence. Instead, our inquiry must focus on Donaldson’s primary assertion that errors of law caused a miscarriage of justice. See Wojcicki, 447 Mass. at 216. As discussed more fully below, the motion for a new trial is DENIED.
1. The Trial Judge and Courtroom Environment
Donaldson raises a litany of complaints about the courtroom environment and the way in which the proceedings were managed. He complains that this Court: (1) caused the only minority member of the jury to abandon the jury; (2) was biased against plaintiffs in employment discrimination cases; (3) conducted much of the proceedings at sidebar; (4) provided defense counsel with repeated suggestions; (5) indicated a willingness to allow expert testimony by the defendants’ economic expert; (6) created a “chaotic” trial atmosphere; (7) improperly admonished Donaldson’s counsel, attorney Harvey (“Harvey”), for interrupting the Court in rendering a ruling; and (8) refused to issue to the jury a pre-charge on certain legal issues.
Generally, a party is not entitled to a new trial unless an error has “injuriously affected” his or her “substantial rights.” Sacco v. Roupenian, 409 Mass. 25, 30 (1990), quoting G.L.c. 231, §§119, 132. “A motion for new trial. . . need not be entertained when based upon alleged errors of law that either were raised or could have been raised at the trial.” Raunela v. Hertz Corp., 361 Mass. 341, 345 (1972) (citations omitted). “While a judge may in his discretion permit such a question to be presented on a motion for a new trial, he cannot be required to consider it.” Id. (citations omitted).
a. Excusing members of the juiy
Fifteen jurors were selected initially; three members were excused for various reasons during the trial. One juror was excused because of a death in her extended family (Vol. Ill, 57-58); a second contracted the flu (but offered to return to the juiy as soon as she felt better (Vol. IV, 26-27)); and a third was excused when she was suddenly confronted with child care issues after a large snowstorm predicted for Monday, December 3, canceled Worcester public schools. Twelve jurors ultimately deliberated.
Donaldson’s counsel presently complains that the court excused this last juror, although he failed to object to that dismissal at trial. (Vol. Ill, 5-6.)
On Monday, November 26 and Tuesday, November 27, the venire was told that the trial was expected to continue through that Friday, and “likely next Monday.” (Vol. I, 57-58.) This estimate was based on conducting the trial for full days each day and both parties’ efficiently presenting their cases. Defense *531 counsel agreed with this assessment (Vol. V, 268); Donaldson’s attorney did not.
The jury in this case included Samantha Guzman, who, according to her juror questionnaire, was born in Mexico. On Friday, November 30, when it became clear that the trial would continue into the next week, this Court apologized for the inconvenience to the jury, emphasized the importance of the matter to the parties, and commented that the jurors should be guided by their conscience when deciding whether to return for the second week of trial.
Meteorologists forecast a large snowstorm for the following Monday, December 3rd, for Worcester, Massachusetts. In anticipation of this event, schools were canceled. Twelve jurors made it into court; one did not. In fact, that juror called the Court that morning and asked to be excused because of childcare issues. The anticipated snowstorm that had caused school cancellations that required her to stay home to care for her children.
It being Monday morning, I have a note from the court officer. Samantha Guzman [ ] is unable to be here. Her jury identification [number] is ... She has children who are home from school, and from that I gather she has child-care issues that are overwhelming, so that juror will be excused.
(Vol. VI, 3.)
I just want to make sure we get started. It’s Monday morning. We have had a snowstorm, and I don’t want to lose any more jurors.
(Vol. VI, 9.)
Donaldson’s complaint that Guzman’s failure to appear harmed him is based on the assumption that Guzman’s presence on the juiy would have been helpful merely because she, like Donaldson, is a minority. It is within this Court’s authority to excuse jurors for cause during the course of a trial. G.L.c. 234A, §39. Thus, in light of Ms. Guzman’s child-care situation, it was not error to excuse her from the jury.
As to the Court’s Friday comments, the Court issued a remedial instruction to the jury advising the remaining members that they were required by law to attend the trial until its completion, which the remaining jurors did.
b. The trial judge’s alleged bias
According to Donaldson, on day three of the trial, this Court stated that it was biased against plaintiffs in employment discrimination cases such as Donaldson’s. The alleged bias arose during a discussion of the admissibility of a series of letters exchanged between Harvey and Akibia’s in-house counsel, Attorney Scott Sidell (“Sidell”), prior to trial. The following discussion occurred at sidebar, outside the presence of the jury:
The Court: Wait a minute. Let’s not get far afield. I just — My question was a very simple one. What are you engaging in this process, but for settlement purposes? And I am talking about the Sidell letters back and forth and your letters to him. It’s all— Harvey: Investigation, your honor, investigation.
The Court: To two ends, as I see it. . . One, you are looking for some monetary settlement.
Harvey: After the investigation, yes.
The Court: And if you don’t get the figure you want, you are going to sue them.
Harvey: Yes.
The Court: It’s a dual track.
Harvey: First you do the investigation. Then you do the negotiations.
The Court: Yeah. See, I have a fairly — how do I say this politely — suspicious view of such settlement negotiations because it looks to me like you sucked them in; not you, but—
Harvey: Holy Smoke.
The Court: It looks to me like you say, “Give me all this data. Give me all this information,” which ultimately you use against them. Then you say, “Oh, the number doesn’t satisfy us.” Then you make a determination that there is — there is a case there.
Harvey: Your Honor—
The Court: Under the pretense — under the pretense that we are going to investigate this and see — you know, you just told me you had two hats on when you are doing this.
Harvey: Your Honor, when you say that I “sucked them in” that’s offensive to me. It’s completely wrong ... I want to find out, and any decent lawyer wants to find out, whether you have a meritorious case before you bring the case, and I was doing exactly what my duties as an officer of the court required me to do. When I found out that they — that they had statistics that were atrocious, it raised suspicions in my mind; and when they stonewalled me on a bunch of things, primarily what was the reason for his termination, and then when they stated that Richard Malysa was not a reason, he said, “Well, okay. I guess that — well, there must not be a reason.”
The Court: So this was a bona fide, good faith effort to really determine the investigation, not with one eye on litigation?
Harvey: Well, of course I had one eye; but I had one eye on no litigation, too. I have over thirteen hundred hours invested in this case. I don’t do that on a whim. I want to investigate. I don’t take many cases like this. I investigate before I take a case. The Court: I hear you. I see your point. Okay. Well taken. I have seen a lot of lawyers do things a little less above board, and it makes you jaded.
This was neither a direct attack on Harvey, nor did it demonstrate bias against plaintiffs in employment *532 discrimination cases.[3] It was a discussion of eviden-tiary issues in the context of objections to certain documents that memorialized settlement negotiations. Against this backdrop, the Court expressed concern about how an attorney might use information gained in settlement negotiations against an adverse party.
There was no improper bias. Indeed, relevant portions of attorney Harvey’s May 21, 2002 letter to Sidell and Sidell’s June 6, 2002 response were both admitted into evidence to enable the plaintiff to present evidence in support of the theory that Akibia and Tucker changed the rationale for terminating Donaldson. Thus, even if it were error for this Court to comment on a general suspicion of certain litigation tactics (all of which occurred at a sidebar conference), Donaldson was not at all prejudiced by such comments. As much of the evidence as was proper was admitted in light of the general evidentiary rule precluding the admission of evidence gleaned from settlement negotiations among the parties. See Mark S. Brodin & Michael Avery, Handbook of Massachusetts Evidence, §4.6 (2007).
c. Side bar conferences
Donaldson next challenges the amount of business conducted at sidebar throughout the trial. In his estimation, the eight-day trial included between twenty and thirty sidebar conferences to address a variety of issues: evidentiary objections, procedural discussions, and finalizing jury instructions. Donaldson claims that the “secrecy” of the sidebar conferences both (1) prevented Donaldson from hearing many of the proceedings that ultimately determine the outcome of his claim, and (2) violated the spirit of openness in a democracy. Donaldson’s counsel did not object during trial to the Court’s use of sidebar conferences. On several occasions, Donaldson joined his counsel at sidebar. In addition, when sidebar conferences were held at times and the jury was not present, they were conducted at normal voice levels. Neither party indicated at the time an inability to hear the discussions. The sidebar conferences were consistent with standard trial practice. Donaldson’s substantial rights were not harmed in any way.
d. Claimed suggestions for defense counsel
Donaldson asserts that the Court “repeatedly made suggestions to defendants’ counsel.” He cites two examples to support his claim.
First, during impanelment, the plaintiffs counsel claims that the Court suggested that the defendants’ counsel consider asking the Court to discharge a potential juror for cause. The plaintiff s counsel then claims that defense counsel thereafter challenged one prospective juror for cause, and that the prospective juror was excused. However, the actual course of events fails to support plaintiffs counsel’s memory. During individual voir dire, in which both counsel were actively encouraged to participate (see Yol. I, 76), the juror in question revealed possible bias in a variety of fashions:
Mr. Harvey: Do you start off with an assumption that claims of discrimination are frivolous?
The juror: I don’t think so at the particular level of this plaintiff. I think that they can be when people are let go, and their first reaction is they sue for their job back, in our case we offered it back, and they didn’t want it. They just wanted the money.
The Court: So you can give [the plaintiff] a fair shot is what everybody is asking ?
The juror: I can try. I think I can.
*************************
The juror: My wife was recently let go back in April of this past year from the company she was with for a number of years. It was more a personality conflict. It was a small, privately owned firm. She has since found other employment. There was no justifiable reason why she was let go.
Mr. Casey: And that’s why you think it was unclear?
The juror: Yes.
Mr. Casey: Do you understand the concept of or have you heard of the concept “employment at will”?
The juror: I don’t know.
Mr. Casey: [explains employment at will concept).
The juror: Okay.
Mr. Casey: Does that change your perception or not your wife was treated unfairly in her termination if, in fact, she was — and I don’t know the details of the case, but if in fact, she was an employee at will?
The juror: I believe, if that were the case, I don’t know about my perception about her being let go, though. I still think it was unfair.
Mr. Casey: Because she was performing and—
The juror: Yes. Absolutely.
(The juror stepped away from the sidebar.)
The Court: What do you want me to do with him?
Mr. Casey: I would probably strike him, your Honor.
The Court: You would probably strike him?
Mr. Casey: I would be inclined if he is to put on — to consider using a peremptory challenge. My concern is that — again, that’s why I asked (sic) the employee at will policy, that he thinks—
The Court: He has a problem with that concept. I am going to dismiss him. He is excused.
(Vol. I, 132-35.)
The transcript makes clear that that this prospective juror was troubled by the number of frivolous discrimination claims, suspicious of the motives of such claimants, bitter about his own wife’s discharge from employment, and unwilling to accept the legal principle of at-will employment. These issues triggered deep concern about the juror’s ability to be impartial. *533 His excusal was appropriate. The Court well knew how to excuse a juror for bias (in fact, it had done so on many occasions up to this point injury selection) and needed no instruction from either counsel as to what action to take. The question posed to counsel, “What do you want me to do with him,” was a request for argument by each counsel as to whether this juror should be seated. Such argument can be enlightening to the Court. Instead, the plaintiff now wrongly insinuates that this simple request had a sinister character to it.
A trial judge has the duty to question prospective jurors during the impaneling of a jury. Mass.RCiv.P. 47(a). Based on an individual’s response to the questions, either the judge or the attorneys may discharge prospective jurors from the pool. See Smith & Zobel, Rules Practice §47.3, at 167 (1977). The claimed “suggestion” had the same ultimate effect — the removal of a potentially biased juror for cause — as if this Court had excused the juror. There was no error.
Donaldson’s present claim is utterly without support in the record. Moreover, such revisionist argument ignores a vital fact: at the time, Donaldson’s attorney did not object.
Second, Donaldson’s counsel takes issue with a sidebar discussion on November 30 regarding the fact that Donaldson’s expert economist maintained an office in the same building where Donaldson’s attorney maintained his office. According to Donaldson, this discussion suggested a line of cross-examination of the expert for defendants’ counsel. The Court’s sidebar observation that the attorney and his expert shared a common address was of no consequence: defense counsel thought so little of the point that he never brought it during cross-examination. Donaldson’s attorney again seeks to paint a sinister quality to a casual observation, borne of surprise: no such conspiracy can rationally be alleged.[4]
e. The defendants’ economic expert
On the fifth day of trial, this Court stated that it was “inclined” to allow the defendants to present expert economic testimony by Craig Moore potentially to rebut the testimony of Donaldson’s expert, Martin Duffy. At the time of tire discussion, Donaldson’s counsel, Harvey, had the chance to argue why Moore should not testify, but did not do so. Harvey now claims that this decision caught him by surprise because the defendants did not disclose any expert witnesses until November 25, 2007, the day before the trial began. Moore never testified at trial, but Harvey nevertheless claims improper prejudice because he was forced to take time to prepare for Moore.
The short answer to this issue is that there are many possible contingencies for which trial counsel must prepare during a trial; such is the nature and challenge of trial advocacy.
f. Court atmosphere
Donaldson describes at least three situations throughout the trial in which he claims that the Court sent “signals” to the juiy about the importance of this case that created an atmosphere that adversely affected him.
(1) Statements to defense counsel
On Monday, December 3rd, this Court expressed to defense counsel that he should take as much time as he needs to present his case. Donaldson takes issue with this statement because of this Court’s comments on the previous Friday to the juiy about the fact that the trial was taking longer than expected. According to Donaldson, by indicating to the defense that they should take as much time as they need to present their case, this Court improperly signaled to the juiy that the defendants’ case was more important than Donaldson’s case. This assertion is without merit. Indeed, at the time the comments were made to the defense counsel, the plaintiff had rested after having had a full opportunity to present his case. Donaldson’s counsel did not object to the comments when they were made, nor did he request any kind of clarifying statement to the juiy. There is no evidence that this comment to the defendants’ counsel had any effect whatsoever on the juiy.
To the contrary, the Court repeatedly emphasized the importance of this case to both sides:
Now I realize that (juiy service] is an inconvenience for all of you, I also realize it has taken a good number of years for this case to work its way through the system so that these folks can have their day in court.
(Vol. I, 58.)
So please, please, please respect the fact that the litigants have waited for their day patiently, and this is the day in which they are looking for justice.
(Vol. I, 59.)
This theme was later stressed to the jury:
[This] is an important case to the people who are involved in this case obviously.
(Vol. I, 174).
The point was made again:
I don’t want to cut off anybody’s right to present their case. I have a veiy difficult [[[job] manag[ing] the time process . . . You’ve [the juiy] been veiy attentive. I’m also sensitive to the fact that these folks have waited four to five years ... to get this case to you.
(Vol. V, 274-75.)
Moreover, the court’s memoiy is that the comment to counsel about taking time occurred outside of the presence of the juiy, during a lengthy argument on various trial issues. (Vol. V, 164.) (The jury had been *534 excused at this point. See Vol. V, 135 through Vol. V, 175.)
(2) Trial schedule
Donaldson next claims that a “chaotic” schedule caused him undue prejudice by exasperating the jury and that this Court “caused” the trial to last eight days. Donaldson complains specifically that this Court: (1) conducted a jury trial on November 26 before the impanelment of this jury; (2) required jurors to work full days from 8:30 a.m. — 4:30 p.m.; (3) held numerous sidebar discussions; (4) recessed for nineteen minutes at one point after Donaldson’s counsel repeatedly interrupted the court (see further discussion of this incident in section 11(B)(1)(g) of this memorandum below); (5) handled other matters of court business while the jurors waited in the jury room; and (6) provided the special verdict slip to the jury after they had been deliberating for a couple of hours.[5] At the root is Donaldson’s residual disappointment that the jury had been told the trial would likely last six, not eight days.
Trial courts in the Commonwealth are busy places and trial judges must juggle numerous responsibilities throughout the course of a day. During the course of this trial, short motions were addressed each day at 2 p.m., before the jury returned from lunch at 2:30 p.m. The parties themselves brought numerous motions and other issues requiring the Court’s attention. For example, before trial began, the Court had to address ten motions in limine (eight by the plaintiff, two by the defendant), a motion to exclude an expert witness, a motion to quash a trial subpoena served which sought a broad range of documents amounting to 86 categories of documents, a motion to introduce five lengthy deposition transcripts in lieu of trial testimony, and a host of objections to each of those five transcripts. In this last regard, the parties consumed a lot of time addressing the admissibility of various portions of deposition testimony.
In addition, this trial in particular was hampered by a court reporter arriving two hours late for work on one day of the trial. Donaldson’s counsel did not object at any point during the trial that it was being unnecessarily delayed. Nor is there any evidence that the jurors were exasperated at all. It is a fiction that the jurors focused any such claimed frustrations on the plaintiff.
To the contrary, before the verdict, Donaldson’s attorney lauded the jury as “well educated” (Vol. Ill, 298), agreed with the court’s assessment that “they are into it” (Vol. Ill, 299), and indeed, at one point, volunteered:
I firmly believe these [twelve] people are smart, and they will do the right thing . . . And I’ve got at least two people who are boring a hole in with their eyes through the defendants during this trial. I love this jury.
(Vol. IV, 17-18) (emphasis added).
It was a long trial and the members of the jury were asked to be in the courthouse for full days. The jurors worked hard at their task. The courtroom was busy. Jurors took the job seriously and deliberated thoroughly before rendering their verdict. There is no evidence that the verdict was the product of “bias, misapprehension or prejudice.” Turnpike Motors, Inc., 413 Mass. at 127.
(3) Events during the juiy charge
Donaldson complains of two instances during the jury charge that reveal a lack of care of the seriousness of the case and further agitated the jury. First, Donaldson complains that this Court mispronounced “Aki-bia” several times. To the extent the mispronunciations caused prejudice to anyone, they prejudiced the defendants, not Donaldson. Upon correction by counsel, this Court apologized for the oversight. Donaldson now also complains about the pace of the juiy charge, but made no objection at the time. To the contrary, the juiy appeared to have understand the charge because they labored for eight hours with little inquiiy to the court about the meaning of various terms in the charge.
Second, Donaldson complains that the proceedings were recessed to research an “absurd” proposition of law. The defendants requested an instruction that the juiy could only award damages for emotional distress to the plaintiff if the plaintiff had proved those damages by “substantial evidence.” See Stonehill College v. Massachusetts Commission Against Discrimination, 441 Mass. 549, 576 (2004). Donaldson’s counsel objected to the instruction because he believed that the instruction would require some standard greater than a preponderance of the evidence. The matter was researched to confirm the proper ruling in an effort; an effort to which Donaldson’s attorney now objects, describing such as “absurd.” Indeed, after researching the point, Donaldson’s counsel’s objection was sustained. The defendants’ requested instruction was refused. There was no error.
g. Recess of Proceedings
On the fourth day of trial, Donaldson’s counsel repeatedly interrupted this Court while dealing with a multitude of evidentiaiy issues. After one such interruption, the proceedings were suspended and this Court instructed Donaldson’s counsel to alert the court officer when counsel could assure this Court that he would not interrupt anymore. (Tr. Vol. V, 19-20.) According to Donaldson’s counsel, the nineteen-minute delay before this Court resumed session caused the jury to resent Donaldson because it was Donaldson’s conduct that forced the juiy to be in court and led to the delay.
Donaldson’s claim has no merit. A trial judge’s authority in the courtroom includes the ability to ensure an orderly and respectful environment in *535 which to conduct the business of the trial. While interruptions during a court’s explanation of its ruling are often helpful, unrestrained interruptions are not.[6] While it is theoretically possible that the delay caused by counsel’s behavior (which took place at sidebar conference) annoyed members of the jury, there is no evidence, ultimately, that the jury was unduly prejudiced against Donaldson.
h. Refusal to issue pre-charge
Donaldson’s counsel requested a pre-charge to the jury on pretext and the fact that illegal discriminatory bias can be either conscious or subconscious. While the Court declined to issue the pre-charge, it most certainly included the relevant points of law on pretext and the various forms of illegal bias in its final instructions to the jury at the conclusion of the trial. Indeed, Donaldson does not challenge the instructions issued in this case. (Tr. Vol. VIII, 214.) He only challenges the decision to decline to issue a pre-charge. But the plaintiff requested a pre-charge that would have discussed burden-shifting in discrimination cases, a subject disfavored by the Supreme Judicial Court: “We see no reason to burden the jury with terms like ‘premixed motive’ and ‘pretext’ or with rules regarding shifting burdens, all of which have taken lives of their own, independent of their connection to the underlying theories of liability that gave them birth.” Lipschitz v. Raytheon Company, 434 Mass. 491, 508 (2001). The traditional course of action is to instruct the juiy “after the arguments are completed.” Mass.R.Civ.P. 51(b). Issues of pretext and subconscious bias are not so complicated that it amounts to error to have failed to instruct them on such topics before the parties completed their arguments. There was no indication that the jurors were confused or unable to grasp these concepts.
2. Evidentiary Rulings
Donaldson’s next host of claims relate to about eight evidentiary rulings. He asserts that the rulings reveal a double standard against him and in favor of the defendants.
A party is not entitled to a new trial unless an error has “injuriously affected” his or her “substantial rights.” Sacco v. Roupenian, 409 Mass. 25, 30 (1990), quoting G.L.c. 231, §§119, 132. “(T]he substantial rights of a party are adversely affected when relevant evidence is erroneously excluded that, viewing the record in a commonsense way, could have made a material difference.” Id., quoting DeJesus v. Yogel, 404 Mass. 44, 48 (1989). Likewise, the admission of evidence “injuriously affects the substantial rights of a party where the jury might have reached a different result if the evidence had been excluded.” Coady v. Wellfleet Marine Corp., 62 Mass.App.Ct. 237, 244 (2004). Thus, each evidentiary decision must be reviewed to determine first whether there was error, and then whether the error made a material difference to Donaldson’s case.
a. The Severance and Settlement Agreement
According to Donaldson, Akibia retaliated against him for alleging improper discrimination. Some evidence of this retaliation was the fact that Akibia reduced its offer of severance from sixteen weeks ($52,307.68) to nine weeks ($29,423.07). This revised severance and settlement agreement was proposed allegedly after Donaldson first notified Akibia to his belief that he was wrongfully terminated. This agreement was excluded because it amounted to settlement negotiations that are inadmissible as a matter of public policy. See Marchand v. Murray, 27 Mass.App.Ct. 611, 615 (1989) (“[I]t is settled that offers of settlement are inadmissible to establish liability . . whether a discussion is an offer is a preliminaiy question for the trial judge); Brodin & Avery, supra §4.6.
Donaldson now claims that it was error to exclude the agreement because the public policy of preventing discrimination outweighs the policy of protecting settlement negotiations. Specifically, Donaldson asserts that “retaliation in response to an allegation of race discrimination is illegal and evidence of it is admissible under any circumstances.” Plaintiffs Motion for New Trial, p. 13. This argument is without merit. Nothing in the Commonwealth’s anti-discrimination statute can be read to require a suspension of the rules of evidence simply because of the serious nature of a discrimination claim. Thus, it was not error to exclude the severance and settlement agreement.
b. Akibia’s Correspondence
A key fact for Donaldson at trial was that the reason stated by Akibia at trial for Donaldson’s termination (that three key employees threatened to leave unless Donaldson was fired) differed from the original reason given by the company at the time of his termination (that it was differences in his “style” not his “performance”). According to Donaldson, the shifting reasons given by Akibia for Donaldson’s termination indicated that the reasons given were pretext for illegal discrimination. As evidence for his theory, Donaldson attempted to introduce certain letter correspondence exchanged between Donaldson’s counsel and Akibia in the spring of 2002 after Donaldson had been fired. The letters were an attempt by Donaldson’s counsel to ascertain why Tucker terminated Donaldson.
As stated above in section 11(B)(1)(b) of this memorandum, portions of the correspondence were excluded because they were part of settlement negotiations (see Brodin & Avery, supra §4.6); other parts were admitted into evidence to enable Donaldson to attempt to establish evidence to support his argument that Akibia’s rationale for firing Donaldson shifted over time. It was not error to have excluded the portions of the correspondence that contained settlement negotiations. Even if it were, however, their admission would not have made a material difference *536 to Donaldson’s case because he was allowed to introduce the portions of the correspondence that allowed him to demonstrate his point — that Akibia’s reasons for terminating Donaldson shifted over time.
c.Donaldson’s MCAD Charge of Discrimination and Akibia’s MCAD Position Statement
Donaldson also attempted to introduce into evidence documents filed with the MCAD, including Donaldson’s Charge of Discrimination and the defendants’ Position Statement. Donaldson sought to introduce these documents as further evidence supporting his argument that the reasons given by Akibia were pretext. While this Court did not allow Donaldson to introduce the actual documents into evidence, Donaldson’s counsel was allowed extensive opportunity to use the defendants’ Position Statement during his examinations of Tucker and Karen Wall, Akibia’s Human Resources Manager. Donaldson’s counsel had ample opportunity to draw out testimony of what was contained in the Position Statement. As with the correspondence between Akibia and Donaldson, even if it were somehow error to have excluded the MCAD documents, their admission would not have made a material difference to Donaldson’s case because testimony provided substantially the same amount of information as the actual Position Statement itself.
d.The “How to Deal with Dane” Memo
In November 2001, six months before his termination, Donaldson attended a workshop in which he was provided with feedback. Participants responded to questions and their responses were memorialized in a document now known as the “How to Deal with Dane” Memo. Donaldson was fully aware of the contents of the memo because he participated in the workshop. The memo contained both positive and negative feedback. The negative feedback indicated that Donaldson had an intimidating management style feared by some fellow employees.
Rather than seek to have the memo introduced for the truth of the matters asserted in the memo (i.e., that Donaldson was an intimidating manager), the defendants sought to have the memo introduced for the purpose of establishing that Donaldson had notice of the various issues related to his management style. Over Donaldson’s hearsay and relevance objections, the memo was admitted for the limited purpose of establishing Donaldson’s notice of the feedback. This Court instructed the jury to consider the memo only for this limited purpose.
Donaldson now claims that Donaldson’s state of mind was irrelevant — that it was only Tucker’s state of mind that mattered. But, Donaldson’s notice, not his state of mind, was indeed relevant to this case because it tended to negate his assertion that complaints about his management style and his termination surprised him. See Pardo v. General Hospital Corp., 446 Mass. 1, 18 (2006); Brodin & Avery, supra §8.2.2 (“An extrajudicial statement is not hearsay when offered to prove that the person to whom it was addressed had notice or knowledge of the contents of the statement”). Accordingly, it was not error to have admitted the memo.
e.The Mark Henry e-mail
On April 25, 2002, Mark Henry, an Akibia employee, sent an email to Richard Malysa in which Henry criticized Donaldson for Donaldson’s behavior during a meeting on April 14, 2002. Donaldson’s counsel objected to the admission of the email as irrelevant and hearsay. The defendants sought to introduce the email for the limited purpose of showing Tucker’s and Wall’s state of mind at the time of Donaldson’s termination and to provide a legitimate basis for the non-discriminatory business reason for Donaldson’s termination. Contrary to Donaldson’s assertion, the email was not admitted because it was a business record. It was allowed for the limited and proper purpose of demonstrating Tucker’s state of mind at the time of Donaldson’s termination. See Pardo, 446 Mass. at 18. Tucker’s state of mind at the time he terminated Donaldson is relevant because it tends to provide evidence of a non-discriminatory basis for Donaldson’s termination. Accordingly, this decision was not error.
f.Akibia’s Human Resource Information System (“HRIS”) database for April 2002
In his attempt to show a discriminatory environment for African-Americans at Akibia and to challenge the validity of Akibia’s Equal Employment Opportunity Program, Donaldson sought to introduce a printout from April 2002 of Akibia’s Human Resource Information System (“HRIS”). Donaldson intended to use the HRIS report to demonstrate that of the 138 Akibia professionals in Massachusetts, only one— Donaldson — was an African-American. Donaldson also sought to introduce the HRIS report because it included employee names that would have enabled Donaldson to show that Akibia over-reported the actual number of African-Americans that it employed across the country.
Contrary to Donaldson’s assertion, Donaldson was allowed to introduce a version of the HRIS report that included only the sixteen members of Akibia’s executive management team (Donaldson’s most direct comparators) rather than all 138 managers and professionals. Moreover, this Court also allowed Akibia’s EEO-1 reports from 1998-2002 that contained substantially the same information as the HRIS report. For whatever reason, Donaldson’s counsel neglected to introduce the redacted version of the HRIS report at trial. In addition to being willing to allow a redacted version of the report, this Court also provided Donaldson’s counsel with wide latitude to question witnesses about the number of African-Americans employed by Akibia. In fact, during trial, Donaldson’s counsel had repeatedly *537 stressed the lack of African-Americans at Akibia. Thus, any error was not unduly prejudicial because the HRIS report would not have made a material difference to Donaldson’s case.
g. Tucker’s private relationships with African-Americans
At deposition, Donaldson’s counsel asked Tucker if he had any African-American friends with whom he had socialized in the previous two years and whether he had ever been invited to a wedding at which either the bride or the groom was African-American. At trial, when Donaldson’s counsel attempted to inquire about these matters, this line of questions was excluded as irrelevant. It was within this Court’s discretion to weigh the probative value of evidence against its potentially prejudicial effect. This decision should not be disturbed “unless it is palpably wrong.” Bank v. Thermo Elemental Inc., 451 Mass. 638, 670 (2008). In light of the potential for undue prejudice on the jury, this ruling was correct and cannot be the basis for granting a new trial.
h. Favorable comments about Donaldson made by fellow Akibia employees
Donaldson sees error in the decisions to allow the Mark Hemy e-mail without Henry’s in-court testimony, but to exclude sixteen e-mails from Akibia employees praising Donaldson unless those sixteen employees appeared in court to testify.[7] Donaldson attempted to introduce sixteen e-mails from Akibia employees supportive of Donaldson. According to Donaldson, the positive statements made by his former colleagues should have been admitted as statements of an adverse party as an exception to the hearsay rule.
The sixteen e-mails from supportive former colleagues are clearly hearsay because they are out-of-court statements offered for the truth of the matters asserted (i.e., that Donaldson is all the good things contained in the e-mails). He provides no specific legal argument for which element of the party-opponent hearsay exception he believes applies to this case. According to Proposed Mass.R.Evid. 801 (d) (1){2):
A statement is not hearsay if— . . . The statement is offered against a party and is ... (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship . . .
Here, the sixteen e-mails were not statements by a party opponent because none of the sixteen former colleagues were speaking as agents of Akibia when sending supportive e-mails to their former co-worker. See Brodin & Avery, supra §8.6.1. Furthermore, there can be no double standard where, as here, one piece of evidence is arguably admissible (e.g., the Henry e-mail), while another piece of evidence is clearly inadmissible (e.g., the sixteen supportive e-mails). As the sixteen e-mails did not fit within a recognized hearsay exception, it was not error to have excluded them, especially in light of the fact that none of the e-mail writers were unavailable to testify.
3. Quashing the Trial Subpoena
Donaldson next contends that it was error to quash portions of a trial subpoena duces tecum served on the defendants on November 6, 2007, about three weeks before trial. The trial subpoena contained twenty-seven (27) paragraphs and requested, inter alia, the personnel records of both Donaldson and other Akibia employees. Before trial, the defendants filed a motion to quash the subpoena and for a protective order. In their motion, the defendants argued that the motion should be quashed because it was overbroad, unduly burdensome, a transparent attempt to conduct discovery more than two years after the close of discovery, and as such, an effort to circumvent the Court’s previous orders limiting discovery.
Numerous court orders governed discovery in this action. On October 13, 2004, this Court (Agnes, J.) entered an order that enabled Donaldson to seek only certain employee information of managers, but not all employees. On July 10, 2005, discovery closed. On November 21, 2006, this Court (Fecteau, J.) denied Donaldson’s motion for leave to re-open discovery for the limited purpose of determining whether Akibia misclassified certain employees. In denying the motion, Judge Fecteau explained that Donaldson offered “no explanation ... as to the reasons, if any, that the further discovery that the plaintiff seeks could not have been done in a timely manner.”
Subpoenae duces tecum “are subject to supervision by the presiding judge to prevent oppressive, unnecessary, irrelevant, and other improper inquiry and investigation.” Cronin v. Strayer, 392 Mass. 525, 535 (1984), quoting In the Matter of Pappas, 358 Mass. 604, 612 (1971). See also Mass.R.Civ.P. 45(b) (a trial judge may quash a subpoena “if it is unreasonable and oppressive”). Trial judges have discretion to determine the scope and timing of discovery and the “prevention of [discovery] abuse ... is sufficient justification for the authorization of protective orders.” Cronin, 392 Mass. at 536, quoting Seattle Times Co. v. Rhinehart, 467 U.S. 20, 35 (1984).
This trial subpoena was not Donaldson’s first attempt to secure the information requested in the subpoena. A close analysis of the twenty-seven (27) paragraphs reveals that it was within this Court’s discretion to determine the validity of Donaldson’s trial subpoena. First, the parties agreed that Akibia need not produce the information requested in paragraphs 2, 5(a), 9, 12, 15(a), 16, 23, and 25 ((a) through (fl) because those documents had already been pro *538 duced. Second, as stated above, a November 21, 2006 order of this Court (Fecteau, J.) denied Donaldson’s motion to re-open discovery of information as to the information requested by paragraphs 6 and 7 of the trial subpoena. Third, the subpoena seeks information that is beyond the scope of discovery (i.e., discovery limited to employee information of managers only, not all employees) and requests information for time periods that are not relevant to Donaldson’s complaint (i.e., after April 29, 2002, the date Donaldson was terminated). Fourth, the parties agreed that the information requested in paragraphs 17, 18, 19, 20, 21, and 22 was irrelevant unless and until the trial reached a punitive damages phase. Fifth, the information requested in paragraph 3 has already been produced in discovery.
Donaldson offers neither reason nor a showing as to why he failed to seek the remaining information (paragraphs 1, 4, 5(b), 5(c), 8, 10, 11, 13, 14, 15(c), 24, and 26) during the two years of discovery. Despite the close of discovery and the nearness of the subpoena to trial, this Court nevertheless required Akibia to produce portions of the requested information. Donaldson was permitted access to documents containing bonus calculations from 2002 for Tucker, Wall, and Peter Osborne, a senior Vice President of Sales at Akibia and comparator of Donaldson (paragraphs 1(b), 4, and 8(b)). Further, lists of Akibia’s employees in 2002 and 2005 along with each employee’s date of birth (paragraphs 14(a) and 14(d)) were allowed. In order to prevent discovery abuse, the remaining requests were disallowed: such as the personnel records and individual salaries of Akibia’s managers (see Cronin, 392 Mass. at 536), those which sought information beyond the relevant time period (i.e., after April 29, 2002), those beyond the scope of discovery (i.e., for employees other than managers), and those which sought documents long after discovery had closed (i.e., July 10, 2005).
III. CONCLUSION
In an ideal world, the jury is told precisely how long the trial will last, the proceedings are not interrupted by events beyond the Court’s control, both parties consider all rulings fair, and the parties present their case in the most efficient manner possible. The miscellany of issues raised by Donaldson, both individually and cumulatively, however, do not rise to the level of requiring a new trial. There was no miscarriage of justice. This jury took their duties seriously. They arrived early each day, stayed late on most days, and deliberated for about eight hours. Any errors made — -if any — neither materially prejudiced the parties nor affected the outcome of the case. Donaldson had ample opportunity to present his case.
The jury’s verdict was, and is, sound. Donaldson’s motions are DENIED.
ORDER
For the foregoing reasons, it is hereby ORDERED that Donaldson’s motions are DENIED.

Donaldson also filed a motion to strike, taking issue with numerous statements of fact the defendants made in their opposition to his motion for new trial and motion to vacate the judgment. The defendants declined to make the changes requested by Donaldson. Many of Donaldson’s issues with the defendants’ statement of the facts are semantic. To the extent the motion to strike relies on substantive differences in the facts, this Court relies on its own findings. Thus, Donaldson’s motion to strike is DENIED.

Indeed, Donaldson’s attorney forgets the Court’s efforts to repeatedly exhort the parties to reach settlement: first, after the plaintiff testified (Vol. Ill, 297-301); second, after the third day of trial (Vol. IV, 19); and finally, as the jury deliberated.

The exchange, in relevant part, was as follows:
SIDEBAR CONFERENCE:
The Court: . . . One thing before I forget, and I guess I’m kind of geeky in this respect. You’re at 2 Oliver Street, or were at 2 Oliver Street.
Mr. Harvey: Used to be . . .
The Court: And Perseus is in the same [building] . . .
The Court: I was just curious ... I just saw a common address and I was — I know 2 Oliver Street. It’s nice, a nice building.
(Vol. V, 31-32.)

The delay in sending the jury verdict form may, in candor, be shared by both counsel. The court had advised the parties three days earlier in the trial to prepare a special verdict form and agree, to the extent possible, with opposing counsel. (See Vol. VI, 3-4.) They failed to do so. When it came time to provide the verdict form to the jury (see Vol. VIII, 215), the attorneys were still wrangling about which passages in the documents previously marked as evidence ought to be redacted. In fairness to both sides, the trial presented a good number of evidentiary issues (including reviewing five deposition transcripts, line byline, of unavailable witnesses whose testimony was read to the jury). The time requirements presented by these issues reduced the time available to address the verdict form.

This was not the only time the Court felt compelled to ask Donaldson’s counsel to refrain from interrupting the Court (Vol. VI, 74), and twice as to defense counsel (Vol. I, 58 and Vol. Ill, 278). It is possible that Donaldson’s counsel’s self-admitted “emotional” involvement (Vol. IV, 16) in this case led to such outbursts, or, for example, being chastised by opposing counsel for “condescending laughter.” (Vol. Ill, 13.) Dedicated advocacy is obviously laudable, but it is possible to err in such pursuit.

Donaldson also sought to introduce positive comments about him written by another Akibia employee, Scott Flore. Flore’s statements praising Donaldson were excluded unless he were to testify in person. Donaldson complied with this ruling and issued a subpoena compelling Flore’s appearance to testify. After Fiore was served, Akibia withdrew its opposition and stipulated to the admission of Fiore’s statements.